IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

$16,000.00 IN UNITED STATES CURRENCY,

    *Defendant-in-rem*,

Civ. No. 15-658

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, United States of America, brings this complaint in accordance with Supplemental Rule G(2) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, and alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action to forfeit and condemn to the use and benefit of the United States of America property involved in violations of the Controlled Substances Act and 18 U.S.C. § 1952 that is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

**DEFENDANT *IN REM***

2. The defendant *in rem* consists of the following:

    a. Funds up to and including the amount of sixteen thousand dollars ($16,000.00) in U.S. Currency. (hereafter referred to as "Defendant Currency").

3. The Defendant Currency was seized by the Drug Enforcement Administration on April 15, 2015 at Albuquerque, in the District of New Mexico.

4. The Defendant Currency is now, and during the pendency of this action will be, in the jurisdiction of this Court.

## JURISDICTION AND VENUE

5. The United States District Court for the District of New Mexico has subject matter jurisdiction under 28 U.S.C. §§ 1345, 1355(a) and 1356.

6. Venue for this civil forfeiture action is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395, as acts or omissions giving rise to the forfeiture took place in this district and the property is found in this district. Upon the filing of this complaint, the Defendant Currency will be arrested by execution of a Warrant for Arrest *In Rem* in the District of New Mexico.

## FACTS

7. On or about September 15, 2010, in the 3rd Circuit Court for the State of Michigan, Joseph Samson Rivers was convicted of the felony offense of Carrying Concealed Weapons and the misdemeanor offense of Possession of Marijuana.

8. On or about April 4, 2011, in the 3rd Circuit Court for the State of Michigan, Joseph Samson Rivers was convicted of the felony offense of Delivery/Manufacture of Marijuana.

9. On or about April 18, 2013, while serving a two-year sentence of imprisonment imposed on January 25, 2012 following a felony conviction, Joseph Samson Rivers was caught in possession of five white envelopes containing marijuana concealed in his state prison pants.

10. On or about January 31, 2014, in the 8th Circuit Court for the State of Michigan, Joseph Samson Rivers was convicted of attempted possession of contraband by a prisoner.

11. On August 8, 2014, a Michigan State Trooper pulled over a 2014 Nissan for traffic violations. The driver and sole occupant of the car was Joseph Samson Rivers. The

Trooper immediately smelled the odor of marijuana when he made contact with Rivers. A subsequent search of the car revealed two locked metal and plastic boxes in the trunk. Rivers denied ownership of the boxes. The Trooper opened the boxes and discovered six clear jars containing marijuana, three clear bags containing marijuana, two boxes of clear plastic bags, and a digital scale bearing marijuana residue. The combined weight of the marijuana was 5.1 ounces. Rivers also had a small bag of marijuana on his person. Officers discovered that the 2014 Nissan had been rented from Enterprise Rental Car by River's mother, Mary Jackson. Rental paperwork was not found in the car.

12. On August 22, 2014, Joseph Samson Rivers and other individuals received delivery of an express mail parcel mailed from Phoenix, Arizona to a residence in Riverview, Michigan. The parcel contained ten pounds of marijuana.

13. On March 9, 2015, Downriver Area Narcotics Organization (DRANO) officers were investigating a tip that narcotics activity was occurring at 28 West James Street in River Rouge, Michigan. A 2012 Chrysler was parked in the driveway at the address with the engine running and lights on. As an officer got closer to the car, he smelled the odor of marijuana emanating from the car. Upon approach, the officer saw that the driver and sole occupant of the car, Joseph Samson Rivers, had a bag of marijuana in his left hand. When asked if he had anything else in the car, Rivers replied "yes" and reached for a black box on the front passenger seat and opened it. The box contained seven baggies containing marijuana, a digital scale, and baggies used to package marijuana for sale.

14. On this same date, in addition to illegal drugs, packaging material and a scale, Rivers had cellular phones in his possession, one of which was a Samsung Galaxy S4 phone. Officers obtained and executed a search warrant for the Samsung phone. Text messages from

August 22, 2014 through March 9, 2015 were recovered from the phone pursuant to the search warrant. Attached as Exhibit 1 to this complaint for forfeiture is a copy of the log of the recovered text messages from the phone. Personal contact information and racial epithets are redacted.

15. The Drug Enforcement Administration conducted an analysis of the text messages, which revealed at least 122 text messages in which individuals referenced illegal drugs or ordered and/or sought to purchase illegal drugs from Rivers. These text messages are highlighted in Exhibit 1.

16. The term "kush" is used in the text messages. "Kush" is slang for high grade marijuana.

17. The text messages also refer to Joseph Samson Rivers by the nicknames "Kush" or "Joe Kush."

18. The term "loud" is used in the text messages. "Loud" is slang for high grade marijuana.

19. Message number 1176 sent to Rivers' Samsung phone on March 7, 2015, states as follows: "PK Kush straight from Cali. 100 a quarter."

20. On April 15, 2015, Drug Enforcement Administration (DEA) Special Agent Jarrell Perry reviewed an Amtrak Train Passenger Name Record (PNR) in the name of Joseph Rivers, reflecting one-way travel from Dearborn, Michigan to Los Angeles, California on Amtrak Train number three, purchased via the Internet on April 13, 2015 at 9:15a.m. for $204, one day prior to the departure of the Amtrak Train from Dearborn, Michigan. The reservation reflected travel in the coach section of the Amtrak Train. Based upon his training and

experience, Agent Perry knew that drug and money couriers involved in illegal drug trafficking commonly purchase one way tickets shortly before departure.

21. On this same date, Agent Perry and Agent Gerald Maestas were at the Amtrak Train Station in Albuquerque, New Mexico to meet westbound Amtrak Train number three when it arrived for its regularly scheduled stop. Agents Perry and Maestas boarded the coach section of the train and began conducting consensual encounters with the passengers who were aboard. Agent Perry approached a male, later identified as Joseph Samson Rivers, who was seated in an aisle seat on the left-hand side of the coach car, approximately three-fourths of the way from the rear of the coach car. Agent Perry stood at the front of Rivers' seat, out of the aisle so as not block Rivers' egress from his seat or movement on the Amtrak Train.

22. Agent Perry asked, "How are you doing sir?" Agent Perry displayed his DEA badge, credentials, and identified himself as a police officer. Agent Perry asked Rivers for permission to speak with him and Rivers said, "Yeah." Agent Perry asked Rivers if he had his train ticket with him and Rivers began to search through his pockets. Agent Perry asked Rivers for permission to see his ticket. Agent Perry asked Rivers how his trip was going and Rivers replied, "It's going pretty good." Agent Perry asked Rivers where he was traveling to and Rivers said, "Uh, Los Angeles." Rivers handed Agent Perry an Amtrak Train ticket in the name of Joseph Rivers with a Dearborn, Michigan origination. Agent Perry asked Rivers if he lived in Dearborn and Rivers said, "No I live in Romulus, like right in the same area."

23. Rivers said that this was his first trip on the Amtrak Train. Agent Perry informed him that the Amtrak Train is checked in Albuquerque, New Mexico for security reasons. Agent Perry asked Rivers if he was on vacation or work and Rivers said, "Work and kinda both." Rivers stated that he was a video editor. Agent Perry observed Rivers had a non-commercial,

point and shoot, personal use type of camera hanging around his neck. Agent Perry asked Rivers how long he was planning to stay in California, and Rivers responded, a few days to network a little bit and expand his horizons.

24. Agent Perry asked Rivers if he had luggage with him on the train. Rivers identified a blue suitcase in the overhead luggage compartment and a small bag in the floor area by his feet. Agent Perry asked Rivers if he had any weapons or contraband in his luggage and Rivers replied, "No." Agent Perry asked Rivers if he would consent to a search of his luggage for contraband and Rivers answered, "Yeah." Agent Perry searched the small bag with negative results for contraband.

25. Agent Perry asked Rivers if he was planning on returning via the train. Rivers said, "No, probably not, I haven't decided yet." Rivers advised that he had traveled to California for work in the past.

26. Agent Perry unzipped the blue suitcase. He immediately smelled a very strong odor of raw marijuana wafting from inside of it.

27. Agent Perry moved a few articles of clothing around and observed a white colored envelope containing a large loose bundle of money underneath the clothing. Agent Perry observed that the money appeared to be all $100.00 bills. Agent Perry picked up the envelope and asked Rivers how much money he had in the envelope. Rivers mumbled two times and said, "It's a large amount."

28. Agent Perry asked Rivers where he was staying in California and Rivers responded, "The Comfort Inn." Rivers stated that he had already booked his hotel in Los Angeles via the Internet. Agent Perry placed the envelope back into the bag and returned Rivers' suitcase to its original position.

29. Agent Perry requested and received permission from Rivers to search his person for contraband. Agent Perry searched Rivers with negative results for contraband. Agent Perry asked Rivers if he had identification with him, and Rivers handed Agent Perry a Michigan Identification Card in the name of Joseph Samson Rivers with a Romulus, Michigan address. Agent Perry returned Rivers' identification and spoke briefly with another passenger. Agent Perry asked Rivers if Agent Perry could speak with Rivers downstairs and Rivers replied, "Yeah." Rivers rose from his seat and walked downstairs followed by Agent Perry.

30. Once they were downstairs, Agent Perry asked Rivers how much money he had inside of his suitcase and Rivers said, "It's a large amount of money to go rent out some property as well, you know." Agent Perry asked Rivers how much was a large amount of money and Rivers answered, "It's $16,000." Rivers stated that all the money belonged to him and that he was renting out a Villa in Hollywood Hills to shoot some video. Rivers claimed that he was shooting a music video and that the Villa cost $3,000.00 per night. Rivers stated that he had obtained money from his real estate business in Michigan with his mother and that he also does video editing. Rivers added that he shoots video and then attempts to get people to use the scenery from his video for their videos. Agent Perry asked Rivers if he had reserved the Villa. Rivers responded that he had printed out the information for the Villa, but that he did not bring it with him. Rivers advised that the Villa was on LuxuryRentals.com.

31. Agent Perry again asked Rivers for his identification. Agent Perry handed the identification to Agent Maestas to conduct a criminal background check. Agent Perry asked Rivers if he had been arrested and Rivers responded "for a gun charge." Agent Perry asked Rivers if he had been arrested on any drug charges and Rivers stated, "for possession drug charges." Agent Perry asked Rivers if he had any drug charges for the sale of drugs. Rivers

replied that he had "something on there like that in 2010." Rivers stated that the charge was for possession with intent to distribute because he had "drugs in different baggies."

32. Agent Perry asked Rivers if the money had come from a bank. Rivers replied yes, he had a couple of business accounts in Michigan. Agent Perry asked Rivers when he had withdrawn the money. Rivers responded that he took out some money approximately one week ago and then more money a couple days before departing Michigan. He identified Chase Bank and a Credit Union as the banks from which he had withdrawn the money. Rivers stated that his mother had withdrawn some of the currency from the bank for Rivers as she had access to his bank accounts. Rivers identified his mother as Mary Jackson. Agent Perry asked Rivers if his mother knew that he was on this trip to California. Rivers replied that she knows he does video editing on this trip to California. Rivers stated he did not have the Villa reserved because he wanted to look at it first. Agent Perry asked Rivers how he knew that the Villa was not already rented out to someone else, and Rivers responded that it showed that it's not rented on the internet.

33. Rivers provided Mary Jackson's telephone number. Agent Perry dialed the number, but no one answered the phone. Agent Perry asked Rivers if he would try to contact his mother on his cellular telephone. Rivers dialed a number and handed the phone to Agent Perry. Agent Perry spoke with a female who identified herself as Mary Jackson. Agent Perry identified himself to her and asked if her son was in route to California. Jackson stated that Rivers did have money with him to go to California and that she had given some money to him. Jackson also said that she had given Rivers some money she had withdrawn from the bank and some money from an income tax return. Jackson did not know exactly how much money she had given to Rivers.

34. Agent Maestas confirmed that Rivers had prior arrests for drug charges and informed Agent Perry. Agent Perry returned Rivers' identification and informed him that he was free to return to his seat if he wished.

35. A few minutes later, Agent Perry re-approached Rivers, who was in his seat and asked him if he could pick up his bag and speak with Agent Perry downstairs. Once downstairs, Agent Perry informed Rivers that the money would be seized because agents believed that the money was involved in the illegal narcotics business. Agent Perry removed the white envelope from Rivers' suitcase. When Agent Perry asked Rivers why he had to transport cash, Rivers replied that he did not have a bank account in California. Agent Perry informed Rivers that his explanation did not make sense because he has bank accounts in Michigan and could have wired or withdrawn money from Chase Bank in California.

36. Agent Perry filled out a personal property receipt for an unknown amount of currency, and he and Agent Maestas signed the receipt. Rivers refused to sign it. Agent Perry gave Rivers a copy of the receipt and explained the process for filing a claim for the money. Agents Perry and Maestas placed the white envelope containing the money into an evidence envelope and sealed it in Rivers' presence.

37. Rivers then informed Agent Perry that part of the money had been given to him by various people who were part of his "business."

38. Agents Perry and Maestas transported the currency to the DEA Albuquerque office and placed the currency into a temporary storage vault. Agent Perry conducted further investigation, which revealed that Rivers had convictions for marijuana possession, a felony conviction for Delivery/Manufacture of Marijuana in February 2011 in Detroit, Michigan and a felony dangerous drug arrest on March 9, 2015 by the Michigan State Police.

39. On April 16, 2015, Task Force Officers Lopez and Gaitan removed the currency from the temporary storage vault. At the DEA Albuquerque Office, Task Force Officer (TFO) Tom Novicki deployed his trained and certified drug detection canine, "Trigger" on the currency. "Trigger" alerted positively for the odor of illegal controlled substance on the currency.

40. On April 17, 2015, the currency was transported to Brinks and counted. The official count totaled $16,000.00.

41. Rivers had traveled to California in the past to purchase illegal drugs for re-sale in Michigan.

## FIRST CLAIM FOR RELIEF

42. The United States incorporates by reference the allegations in paragraphs 1 through 41 as though fully set forth.

43. Title 21, United States Code, Section 881(a)(6) subjects to forfeiture "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

44. Defendant Currency was furnished, or intended to be furnished, in exchange for a controlled substance, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of the Controlled Substances Act and is thus subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

## SECOND CLAIM FOR RELIEF

45. The United States incorporates by reference the allegations in paragraphs 1 through 41 as though fully set forth.

46. Title 18, United States Code, Section 981(a)(1)(C) provides, in part, for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting a "specific unlawful activity" (SUA) as defined in 18 U.S.C. § 1956(c)(7), or conspiracy to commit such offense.

47. 18 U.S.C. § 1952 prohibits interstate and foreign travel or transportation with the intent to (1) distribute the proceeds of any unlawful activity; (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity. Unlawful activity is defined in 18 U.S.C. § 1952(b).

48. Defendant Currency is the proceeds of a violation of 18 U.S.C. § 1952 or is the proceeds traceable to such property and, is thus subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests:

(1) That, pursuant to Rule G(3)(b)(i) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), a Warrant of Arrest *In Rem*, in the form submitted with this Complaint, be issued to the United States Attorney General or to any duly authorized law enforcement officer by the Clerk of this Court, as the defendant personal property is already in the possession, custody or control of the United States;

(2) That the Court direct any and all persons having any claim to the defendant

properties to file and serve their Verified Claims and Answers as required by 18 U.S.C. § 983(a)(4) and Supplemental Rule G, or suffer default thereof;

(3) That the defendant properties be forfeited and condemned to the use and benefit of the United States of America; and

(4) That plaintiff be awarded its costs and disbursements in this action and such other and further relief as this Court deems proper and just.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

STEPHEN R. KOTZ
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274

## 28 U.S.C. § 1746 Declaration

I am a Special Agent with the Drug Enforcement Administration who has read the contents of the Complaint for Forfeiture *In Rem* to which this Declaration is attached; and the statements contained in the complaint are true to the best of my knowledge and belief.

I declare under penalty of perjury and the laws of the United States of America that this Declaration is true and correct, except as to matters stated on information and belief, and as to those matters I believe them to be true.

Dated: **07-27-2015**

_____
Jarrell W. Perry, Special Agent
Drug Enforcement Administration